**AFFIDAVIT IN SUPPORT OF**
**CRIMINAL COMPLAINT AND ARREST WARRANT**

I, Clyde Parsons, being first duly sworn, hereby depose and state as follows:

## I. INTRODUCTION AND AGENT BACKGROUND

1. This affidavit is being submitted in support of a criminal complaint and arrest warrant charging Amara DUKULY ("DUKULY") with a violation of 18 U.S.C. § 201(b)(2) (bribery of a public official).

2. I am a Special Agent with the Department of Homeland Security, Office of Inspector General ("DHS-OIG") and a federal law enforcement officer. I have been employed with DHS-OIG for approximately seventeen years, and since 2017 have worked with various State and Federal agencies, including Homeland Security Investigations ("HSI"). Prior to that, I was a Special Agent with the U.S. Department of State's Bureau of Diplomatic Security ("DSS") for five years, and during that time attended the Criminal Investigator Training Program at the Federal Law Enforcement Training Center in Glynco, Georgia. While serving as a DSS and DHS-OIG Special Agent, I have conducted a variety of sensitive and complex investigations of violations of Title 18 of the United States Code, including public corruption, fraud, bribery, identity and benefits fraud, money laundering, larceny, and immigration-related violations. I have participated in numerous search warrants and I have been the affiant on numerous criminal complaints and search warrants. As a federal agent, I am authorized to conduct investigations of suspected criminal violations of various federal laws, and I have the authority to make arrests and execute warrants issued under the authority of the United States.

3. This affidavit is based upon my personal knowledge, experience and investigation, as well as information related to me by witnesses, other United States Department of Homeland Security ("DHS") agents, Federal Bureau of Investigation ("FBI") agents and other

law enforcement officers and employees in the course of their official duties. This affidavit is intended to show merely that there is sufficient probable cause for the requested criminal complaint and arrest warrant and does not set forth all of my knowledge about this matter. All of the complaints and other materials quoted in this affidavit bear the same spelling, punctuation, and grammar as found in the originals of these records. Otherwise, all conversations and statements described in this affidavit are related in substance and in part. Where I assert that an event took place on a particular date or at a particular time, I am asserting that it took place on or about the date asserted or at approximately the time asserted.

## II. THE RELEVANT STATUTE

4. Title 18, United States Code, Section 201(b)(2), provides, "Whoever -- being a public official or person selected to be a public official, directly or indirectly, corruptly demands, seeks, receives, accepts, or agrees to receive or accept anything of value personally or for any other person or entity, in return for: (A) being influenced in the performance of any official act; (B) being influenced to commit or aid in committing, or to collude in, or allow, any fraud, or make opportunity for the commission of any fraud, on the United States; or (C) being induced to do or omit to do any act in violation of the official duty of such official or person" violates the law.

5. The public official does not have to actually do the official act in question. It is sufficient if he *agreed* to make a decision or take an official action. That decision or action may include using his official position to exert pressure on another official to perform an "official

act," or to advise another official, knowing or intending that such advice will form the basis for an "official act" by another official.[1]

## III. FACTS SUPPORTING PROBABLE CAUSE

### A. The United States Citizenship and Immigration Service

6. The United States Citizenship and Immigration Service ("USCIS") is an agency that is part of the DHS that administers the United States' immigration system. USCIS is charged with processing immigrant visa petitions, naturalization applications, asylum applications, applications for adjustment of status (e.g., from asylee to legal permanent resident), and refugee applications.

7. According to information provided by USCIS, when an individual files a Form I-485, Application to Register Permanent Residence or Adjust Status, the application is assigned to an Immigration Services Officer ("ISO") to adjudicate the application. The ISO reviews the background check results, the biometric data, and conducts an application review. The ISO flags any items that require further review. If there are no flagged items, the ISO renders a decision. If there are flagged items, the ISO may seek additional information or documents from the applicant and therefore issue the applicant a "Request for Evidence" ("RFE") for such additional information sufficient or necessary to adjudicate the application. After the ISO receives documentation pursuant to the RFE, the ISO can render a decision. A supervisor then reviews the ISO's decision. If the supervisor approves the application, it is forwarded to the next stage, which is the issuance of a green card.

---

[1] *See* Third Circuit Model Criminal Jury Instructions 6.18.201B1-2.

8. I have discussed with other DHS-OIG agents and officers the safeguards USCIS has in place to protect the integrity of the Form I-485, Application to Register Permanent Residence or Adjust Status process. First, USCIS has consolidated the processing of applications to one site. Second, USCIS randomly assigns cases to each ISO, thereby eliminating an ISO's ability to handpick cases for their workload. Third, USCIS has implemented a system of structural safeguards designed to prevent an ISO from improperly approving an application when an individual was not entitled to the benefit. For instance, the requirement that all applications be adjudicated at a national servicing center, rather than in the field, reduces an applicant's ability to directly influence the ISO adjudicating a case. Fourth, the USCIS Electronic Immigration System ("ELIS") is compartmentalized, so that each step in the process is independently conducted by a different ISO. For example, one ISO does asylum applications and another ISO does adjustment of status adjudications. Fifth, an ISO supervisor reviews the adjudications of the ISOs. Therefore, the conclusion that an applicant is eligible for a requested benefit is dependent on more than one USCIS employee. Sixth, ELIS has a function that records when a USCIS employee accesses and/or makes a change to someone's immigration record, essentially creating a fingerprint whenever anyone accesses an immigration file.

**B. <u>Background of Defendant Amara DUKULY and Origin of Investigation</u>**

9. DUKULY is a 42-year-old naturalized United States citizen who is originally from Liberia. He is a United States Army veteran and is employed by USCIS, a federal agency, in Fraud Detection and National Security ("FDNS"), as an Immigration Officer (IO) in Philadelphia, Pennsylvania.

10. DHS-OIG agents reviewed DUKULY's duties and responsibilities as an IO for FDNS, which are to conduct inquiries (system checks, interviews, and site visits) to investigate

suspicions of individuals and organizations filing for immigration benefits under application and petition types processed by USCIS. IOs conduct systemic comprehensive reviews to determine fraud levels and vulnerabilities in the adjudication process, as well as address national security and public safety concerns. DUKULY does not have the authority to interfere with or act on any USCIS application that is not assigned to him and therefore outside of his area of responsibility. Furthermore, DUKULY does not work in the Asylum Office or in an Adjustment of Status Office (Green Card/Naturalization).

11. DUKULY has been under investigation by agents and officers from various Department of Homeland Security agencies, including DHS-OIG and HSI, based on allegations of bribery, since approximately 2017.

12. DHS-OIG's investigation arose from a civil complaint filed against DUKULY in 2016, in which Individual 1, a person whose identity is known to me, claimed that in August 2015, Individual 1 went to USCIS and met with DUKULY to discuss her husband's appeal process for his application to enter into the United States. DUKULY allegedly told Individual 1 that for $6,000, he would pull her husband's file out. Individual 1 believed that DUKULY would stop the appeal process. Individual 1 claimed that she met with DUKULY at a restaurant and paid him $3,760 cash. DUKULY allegedly told Individual 1 that the process would take six months. In April 2016, Individual 1 received a letter from USCIS stating that her 2012 appeal was received and USCIS was reconsidering her husband's case, which was inconsistent with the paid arrangement between Individual 1 and DUKULY. Individual 1 further claimed that she contacted DUKULY and asked for her money back. According to Individual 1's complaint, DUKULY originally promised to return her money, but then stated that "he was in the Army, fought in the Iraq War and now is an immigration officer and nothing would be done" and if she

kept asking for her money, he would call his police officer friends and have Individual 1 arrested. For unknown reasons, Individual 1 subsequently withdrew the civil complaint. DHS-OIG attempted to interview Individual 1, but she declined to be interviewed.

13. DHS-OIG interviewed Individuals 2 and 3 after they filed a complaint about DUKULY. Individuals 2 and 3 stated that in February 2018, DUKULY conducted a compliance visit with Individual 3 and requested official documents. Afterward, DUKULY asked to meet with Individual 3 at Individual 3's workplace. During this second meeting, DUKULY claimed that the paperwork Individuals 2 and 3 originally provided was wrong. DUKULY provided Individuals 2 and 3 with a phone number and said that the person they were instructed to call could help them with their immigration issues. Individuals 2 and 3 called the number DUKULY provided and were told they had to pay DUKULY $4,000. Individuals 2 and 3 contacted their immigration lawyer and based on the advice of counsel, did not pay DUKULY or anyone else. Records obtained by legal process for DUKULY's personal cell phone revealed that DUKULY called the phone number that he had provided to Individuals 2 and 3 the day before the second meeting with Individuals 2 and 3. Investigators were not able to identify the subscriber of that phone number or the person Individuals 2 and 3 spoke to on the phone.

14. DHS-OIG interviewed Individual 4, who stated that in 2014 or 2015, DUKULY was working at a table assisting individuals that came to the USCIS office where he worked. Individual 4 later met DUKULY outside his workplace to discuss Individual 4's immigration status. DUKULY asked for money and Individual 4 gave DUKULY $1,500 to ensure her application for citizenship went through. After the payment, according to Individual 4, DUKULY did not do anything to advance Individual 4's citizenship application.

15. DHS-OIG and HSI interviewed Individual 5, a West African, who met DUKULY through a mutual contact in the West African community in Philadelphia, Pennsylvania. Based on word-of-mouth in the community and that mutual contact, Individual 5 believed DUKULY helped West African individuals with their immigration status. Upon meeting DUKULY, DUKULY requested $2,000 to help adjust Individual 5's immigration status and help Individual 5 avoid being deported. Later, DUKULY agreed to help Individual 5 for $1,500. In 2015 or 2016, Individual 5 gave DUKULY $1,500 cash. DUKULY completed immigration forms for Individual 5, which requested an adjustment to Individual 5's immigration status. Individual 5 submitted the forms to USCIS. When Individual 5 subsequently asked DUKULY about the forms, DUKULY told Individual 5 that he did not qualify for his immigration status to be readjusted. When Individual 5 demanded his money back, DUKULY gave Individual 5 only $500 and said he was keeping $1,000 for his "services" and because he "had to pay other people."

16. DHS-OIG also interviewed Individual 6 who met DUKULY in 2015. DUKULY led Individual 6, a green card holder and convicted felon, to believe that DUKULY would be able to get U.S. citizenship for Individual 6 for a fee. DUKULY said Individual 6 would have to pay for individuals to help adjust his immigration status. DUKULY told Individual 6 that he would make sure Individual 6 got his citizenship, even though Individual 6 had had problems in the past. Individual 6 gave DUKULY $5,000 and a 2014 Ford Fusion. Individual 6 was later denied citizenship due to his criminal record. Afterward, Individual 6 still believed that DUKULY would help him, but in 2021 Individual 6 was arrested by Immigration and Customs Enforcement ("ICE") and deported.

17. Given his position at USCIS, DUKULY did not have the authority to do any of the things he promised Individuals 1 through 6. It also appears that he did not get anyone else at USCIS to provide the benefits that Individuals 1 through 6 sought. Instead, after corruptly seeking, receiving, and accepting money in return for being influenced in the performance of an official act, he converted the monies he obtained from Individuals 1 through 6 for his personal benefit.

### C. DUKULY's Recent Solicitation of a Bribe

18. On March 26, 2025, a person known to the Federal Bureau of Investigation and known by DUKULY from the West African community in Philadelphia, Pennsylvania introduced Confidential Human Source 1 ("CHS 1") to DUKULY. The meeting was arranged so that CHS 1 could explain his immigration status to DUKULY because DUKULY was known to work on immigration matters. CHS 1 wore a recording device and captured an audio recording of the meeting.

19. At the beginning of the meeting, DUKULY and CHS 1 discussed CHS 1's background. CHS 1 told DUKULY that he was from Tajikistan and came through the United States' southern border in 2020.

20. In an exchange of questions and answers, DUKULY informed CHS 1 that he was a fraud investigator in the national security field. DUKULY asked CHS 1 if he had been interviewed at the border, and CHS 1 informed DUKULY that he had been interviewed by immigration officials, had also gone to court in April 2024, and was given a new court date in 2028.

21. During CHS 1's conversation with DUKULY, DUKULY suggested that he could get someone else to help CHS 1 with his immigration status. DUKULY also said that helping

CHS 1 would be "expensive," he did not know how much, and he would have to talk to the courts. DUKULY further stated that it would be a process and "someone can go to jail for their lifetime for this. You cannot mess with this kind system. You get me?"

22. DUKULY told CHS 1 that CHS 1 could pay him in installments. At the conclusion of their meeting, DUKULY agreed to meet CHS 1 on April 4, 2025 to receive the first installment of $6,000 cash.

23. On Friday, April 4, 2025, DUKULY met with CHS 1 at a Walmart parking lot at 1570 Chester Pike, Eddystone, Pennsylvania 19022, in Delaware County, in the Eastern District of Pennsylvania. The meeting was audio and video recorded. DUKULY entered CHS 1's vehicle and discussed the terms of their deal, which included CHS 1 paying DUKULY $6,000. Image 1, below, is a screenshot from the video recording that shows DUKULY meeting with CHS 1 inside CHS 1's vehicle.

Image 1



24. At the beginning of their meeting, CHS 1 asked DUKULY what would happen after CHS 1 gave DUKULY $6,000. DUKULY said that he worked for the government and that they paid him "good." He added, "You know sometime when you're somewhere and your people need help, you help." DUKULY explained that he was only helping CHS 1 because of their mutual friend, the person who introduced them. DUKULY implied that the $6,000 was not for DUKULY but was for the people DUKULY recruited to help CHS 1. DUKULY explained that he had people who would help by clearing CHS 1's record of the label "terrorist," an automatic disqualification. DUKULY said he had to pay these people to clean CHS 1's record. DUKULY added, "The people said $12,000 … Me? I should have come to you and said '[CHS 1], 20,000. [CHS 1], 18,000.' I'm not doing that." DUKULY expanded on what was going to happen next, saying "Now, what they're going to do for you, the government think you terrorist… Now, you terrorist, they don't give papers to terrorists here… These people are going to work the system, manipulate, take 'terrorist' off…. Make you regular." CHS 1 said, "Clean." DUKULY repeated the word "clean," then said, "They're going to make it clean then you're going to go through the regular process." DUKULY told CHS 1 that DUKULY would have the opportunity to go to talk to the judge and tell CHS 1's story and explain that CHS 1 is afraid to go back to Tajikistan.

25. DUKULY claimed, "What I'm doing, if it is not my biological brother, I don't do it for nobody. . . . This thing I'm doing, I get paid very well. I don't need nothing from no one . . . But you can't be somewhere you can't help your brothers." DUKULY added, "They're going to take you off terrorist stuff. Big problem, terrorist. And, over there, coming through the border is not good. . . . When you finish everything…you want to give me appreciation, you can do that, that's up to you." DUKULY explained, "It's not that these people going to take green card and give it to you. They're not doing that… They put you on a terrorist watch. They call you a

terrorist, so on the day of your court, the judge will not even want to talk to you. They're going to deny you because they think you terrorist… But you are not, so these people are going to take you from all of that, and put you in regular. Now when you go, you'll be able to see the judge and push your case to the judge. Then you have 90% chances of getting your papers. Versus you not talking to the judge at all and they say 'we don't want to talk to him. He's a terrorist. We want deport him.'"

26. DUKULY repeatedly emphasized that he was not getting CHS 1 "papers," but, he said, "Me fight hard. Fix inside. Clean. With these people, clean." DUKULY then coached CHS 1 about how to talk to the immigration judge and explained what would get CHS 1 "papers." Your affiant understands "papers" to mean official documents that will allow CHS 1 to live and work in the United States.

27. DUKULY addressed the payment schedule with CHS 1. DUKULY said, "Now, these people said they will do their work from now 'til June. They want the second phase of their money, 25%, in June. June, you get 3,000…. Next time, you and I will pay the balance later." At that time, CHS 1 handed DUKULY $6,000 in cash. Image 2, below, is a screenshot of the cash CHS 1 handed to DUKULY.

Image 2



28. Images 3 and 4, below, show DUKULY putting the cash into his pants pocket.

Images 3 and 4



29. After he accepted the $6,000 cash, DUKULY informed CHS 1 that he was going to fight hard for him. DUKULY added that he was not keeping any of the money and that, on Monday, he would give it to the other people he was working with who would remove CHS 1 from the terrorist list. DUKULY said he would give the money to the people and implied that

everything would be done by June. He said, "She got all your information. . . so she's workingon it from now to June. . . her finish." Finally, DUKULY told CHS 1, "Don't say this to no one. Don't- Don't tell lawyer. Don't tell lawyer that you got someone helping you. [CHS 1], you understand?... Don't tell lawyer." DUKULY reiterated that no one, including CHS 1's lawyer, should know. DUKULY departed CHS 1's vehicle with the payment received from CHS 1.

30. As of this date, your affiant is aware that DUKULY has made contact with the person that introduced DUKULY to CHS 1 and requested a meeting with CHS 1 to collect another installment payment.

31. As of June 23, 2025, a review of USCIS databases, including ELIS, since March 2025, has not revealed any activity associated with the identity of CHS 1. Neither DUKULY nor any ISO viewed or made changes to CHS 1's USCIS records. Therefore, there is no evidence that DUKULY made any effort to provide the benefits that CHS 1 was seeking.

**D. <u>DUKULY's Financial Motivation</u>**

32. While DUKULY told CHS 1 that the money CHS 1 paid to DUKULY was not for him, financial records for DUKULY indicate DUKULY is in a poor financial situation. As of April 16, 2025, Equifax records revealed that DUKULY has a credit score of 572, which Equifax judges as "poor." The records also indicate that DUKULY had four credit cards and two charge accounts that were charged off in 2025. Other debts, totaling approximately $17,000 were referred to collection agencies. As of April 18, 2025, TransUnion records indicate that DUKULY is $32,277 in debt. As of March 2025, the credit report records show DUKULY was 30-59 days behind on his mortgage payments.

33. Based on a review of DUKULY's bank account records, it does not appear that DUKULY deposited the cash CHS 1 provided to him on April 4, 2025, into his accounts.

## IV. CONCLUSION

34. In CHS 1's presence, DUKULY accurately represented himself as a fraud investigator and someone who worked in national security, and he also told CHS 1 that he worked for the government and had the type of connections to immigration officials that he could exploit to help CHS 1 adjust CHS 1's immigration status in exchange for cash payments. As detailed above, DUKULY's demand from CHS 1 was not an isolated incident. Beginning in 2015 and continuing through 2025, DUKULY used his status as an employee at USCIS, a federal agency, to extract payments from individuals in exchange for promises to help them obtain adjustments to their immigration status, such as a green card, work authorization documents, or visas. DUKULY met with these individuals in the Eastern District of Pennsylvania.

35. Based on the facts set forth above, there is probable cause to believe that DUKULY has corruptly solicited a bribe, in violation of 18 U.S.C. § 201(b)(2).

## V. REQUEST FOR SEALING

36. I further request that the Court order that all papers in support of this application, including the Affidavit and Arrest Warrant, be sealed until further order of the Court. These documents discuss an ongoing criminal investigation that is neither public nor known to the targets of the investigation. Accordingly, there is good cause to seal these documents because their premature disclosure may give the target an opportunity to flee from prosecution, destroy or tamper with evidence, change patterns of behavior, notify confederates, or otherwise seriously jeopardize the investigation.

*s/ Clyde Parsons*
Clyde Parsons
Special Agent, DHS OIG

Subscribed and sworn to me by telephone on June 25, 2025

PAMELA A. CARLOS
Digitally signed by PAMELA A. CARLOS
Date: 2025.06.25 17:48:29 -04'00'

HONORABLE PAMELA CARLOS
United States Magistrate Judge